## THE CITY OF HARVARD.

District Court, S. D. New York.
Dec. 4, 5, 1930.

William Hayward, U. S. Atty., of New York City (Mary Towle, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (D. M. Tibbetts, of New York City, of counsel), for claimant.

CAFFEY, District Judge.

These facts are established by the evidence:

1. The 18 men named in the libel were aliens.

2. Each was an East Indian and, within the provisions of section 3 of the Immigration Act of 1917 (8 USCA § 136), of a class excluded from admission to the United States.

3. The 18 men were employed on board the City of Harvard when it arrived at Philadelphia.

4. The vessel came from a foreign port.

5. It did not leave the port of Philadelphia for a foreign destination, but went coastwise to the port of New York.

6. Neither at the port of Philadelphia nor at the port of New York, so far as appears, was there permission or consent to any of the aliens temporarily to land for medical treatment or to land pursuant to regulations prescribed by the Secretary of Labor.

7. At the port of Philadelphia a written notice requiring detention of the aliens on board was served by an immigration inspector on the chief officer of the City of Harvard while the master of the ship was temporarily ashore and the chief officer was in charge of the ship.

8. Preceding that notice the inspector assigned to the work had made the requisite investigation to ascertain whether or not there were aboard aliens excluded from admission to the United States.

9. At the time, under an existing order or regulation, the inspector who gave the notice was authorized and required to give notices directing detention on board in cases in which, after investigation, he had ascertained that there were aboard vessels in-

spected by him aliens excluded from admission to the United States.

10. While the City of Harvard was in the port of New York, the 18 aliens named in the libel escaped from the ship and deserted. None of them was aboard this vessel when it left the port of New York or was, so far as appears by the proof, carried away from the port of New York either by that ship or by any other ship.

11. While in the port of New York the master of the City of Harvard, pursuant to authority from the owner of the ship, supplied two watchmen by day and three by night who had been furnished by a detective agency.

12. In the harbor of New York there were considerable temptations and inducements to aliens of this type to desert from ships on which they were employed.

13. That fact was well known at the time to the master of the ship.

14. The activities of the ship during the period of about 2½ months of its stay in New York harbor involved unloading at a dock from one side of the ship and loading of cargo from lighters on the other side of the ship.

15. The situation made it easy for one of the crew to escape.

16. In order reasonably to safeguard against the escape of members of the crew who desired to desert, two guards by day or three by night in a ship of the size of the City of Harvard, even when their work was supplemented by that of an officer of the ship by day and by night in efforts to prevent escapes, was not reasonably adequate under the circumstances in which the ship was placed, while engaged as it was, for the period of time in which it was employed, in the activities of loading and unloading at the place at which she was stationed, to prevent escapes by seamen wishing to desert.

17. The escape from time to time, over the period beginning June 16 and continuing until August 24, of single aliens or in groups of two or in groups of three, on nine separate dates, sufficiently put the master on notice of the necessity of increasing the guard or adopting other measures that were reasonably necessary in order to prevent landing by aliens.

18. After such occurrences it does not appear that any additional safeguards or means were used to avoid escapes.

■ It is clear, as matter of law, that the aliens involved are, within the meaning of

section 3 of the Immigration Act of 1917, in one of the classes excluded from admission into the United States. I think that the service of the notice to detain on board was required by the statute to be given at the port of Philadelphia, which was the port of arrival. I think also that there was no occasion for the Commissioner of Immigration at the port of New York to give a similar additional notice. The condition of the statute that notice to detain be given at the port of arrival was completely fulfilled by the giving of the prescribed notice at Philadelphia. Inasmuch as, under the orders or rules of practice at Philadelphia, the immigration inspector on behalf of the Commissioner of Immigration served notices to detain, it is my view that the notice served in this case was not defective because given by an inspector. Indeed, it would be quite impracticable to conduct the machinery of government unless, under supervision and with appropriate delegation, officials lower down the line were empowered to exercise authority on behalf of the higher officials when so directed.

■ Service on the chief officer on board at Philadelphia during the temporary absence of the master from the ship was, within the meaning of the statute, service on the master. The chief officer of the ship was there as the duly authorized officer in command of the ship and either was himself for the time being master of the ship, or was the duly authorized representative of the absent master, to receive the notice. There again it would be impracticable to administer a statute of the kind we are here engaged on if it were construed so that the notice could not be served except upon the master personally and without repeated visits to the ship until a time when by chance the master could be found on board. The whole purpose of the notice is accomplished when it has been furnished to the officer in charge of the ship. There can be no doubt that the detention notice here came adequately to the attention of the master of the ship quite in advance of its arrival in New York from Philadelphia. The very act of the master in making arrangements for employment of the detective agency tends to corroborate the conclusion that at the time he knew quite well what had been required of him by the notice.

■ What constitutes negligence varies under different conditions. All the circumstances and surroundings must be taken into account in order to determine what character

of action by any one charged with the duty to exercise care is sufficient. In my opinion, omission to exercise that degree of care which under the circumstances is reasonably demanded for effective performance of the duty imposed itself constitutes negligence; and in this case, under all the facts as described by the captain himself in his deposition, I think there was a failure on his part to do enough that was reasonably required of him to prevent the escape of these aliens when he knew, as he did know and as he very frankly states, the danger of their escape and the temptations that were presented in the port of New York to induce them to desert.

I feel, however, that there was nothing flagrant about the conduct of the master or the conduct of the ship. Incidentally it also comes out in the testimony that when the ship left here it took away as new seamen, who had been employed in the port of New York, pretty nearly as many seamen of the same nationality as had deserted. I think therefore that a penalty of $1,500 is adequate in this case.

You may take a decree accordingly.